COX PADMORE SKOLNIK & SHAKARCHY LLP
Steven D. Skolnik (SS-1121)
630 Third Avenue
New York, NY 10017
(212) 953-6633
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

KARKANIAS RESEARCH, LLC d/b/a     **ECF CASE**
CYTIRA and GEORGE KARKANIAS
a/k/a CYTIRA, INC.,        Case No. 07 CV 6113 (RJH) (MHD)

         Plaintiffs,       **DECLARATION**

     -against-

LIFESPAN BIOSCIENCES, INC.

         Defendant.
--------------------------------------------------------x

GEORGE KARKANIAS declares, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a plaintiff in the above-captioned action. I make this declaration in opposition to the motion of defendant LifeSpan Biosciences, Inc. ("Lifespan") to dismiss this action for lack of personal jurisdiction and for improper venue, or in the alternative, to transfer this action to the Western District of Washington.

2.     I am a neuroscientist, having received my Ph.D. in neuroscience from Albert Einstein College of Medicine in 1993. I am the managing member of plaintiff Karkanias Research, LLC d/b/a Cytira ("Karkanias Research") since 2005. In addition, I am an adjunct assistant professor in the Department of Anatomy & Cell Biology at the State University of New York Downstate since 2005 and the endocrinology editor of Cellscience, a United Kingdom-based scientific journal since 2003.

3.      Karkanias Research is a biomedical research and development company with a focus on neuroscience-related research.  I am the sole full-time employee of Karkanias Research. Karkanias Research hires outside technicians and consultants to assist me on various projects.

4.      On or about August 1, 2005, Karkanias Research obtained a grant from the National Institute of Health ("NIH") to study diabetes-induced reproductive problems in women, and more specifically the role of insulin in maintaining reproductive function.  I decided that certain tasks needed for the study would be farmed out to outside providers.

5.      To that end, I contacted The Jackson Laboratory ("Jackson").  Jackson has a strain of mice, some of which would spontaneously develop diabetes and some of which would not.[1]  Karkanias Research entered into a contract with Jackson whereby Jackson would raise a series of such mice, carefully monitoring their physical condition to ascertain which of the mice were diabetic and which were not.  A copy of Karkanias Research's contract with Jackson is attached hereto as Exhibit A.  The brains from these two sets of mice would then be extracted for testing.

6.      Next, we needed to have the brains analyzed to find the levels of various estrogen receptors present in non-diabetic mice versus diabetic mice.  Such an analysis would be done through use of immunohistochemical methodologies.  To find a company with expertise in the immunohistochemical analysis that Karkanias Research required, I searched on the internet and found Lifespan's interactive website.  I contacted Lifespan via the e-mail link on the website, and

---

[1]      Some of the mice would also be in an intermediate state; these mice would be of no use in the initial phase of Cytira's study.

2

Dr. Harjit Kullar, the Director of Sales - Northeast Region, then contacted me.

      7.      Dr. Kullar informed me that Lifespan was extremely experienced in the kind of work necessary for Cytira's study. He informed me that Lifespan worked with Pfizer, Inc., a pharmaceutical company with its headquarters in New York. He offered to come to New York to meet with me, but I did not see the need for a personal meeting and was perfectly happy to work out the details of a contract over the phone and through e-mail. Dr. Kullar put me in touch with the pertinent scientists at Lifespan so that any questions or concerns I had could be addressed. Ultimately, Karkanias Research (under its trade name of Cytira) and Lifespan entered into a detailed contract, dated October 30, 2006, under which Lifespan would do the analysis of the mice brains. A copy of the contract between Cytira and Lifespan is attached hereto as Exhibit B. Lifespan and the employees involved with the Cytira project were aware that their work was part of a larger NIH-sponsored project that Karkanias Research was working on in New York.

      8.      As an initial matter, Lifespan asked me and Karkanias Research to act as its agents in obtaining certain necessary reagents. Lifespan evidently had some problem with the manufacturer of the reagents, so it had us order the reagents, which were sent to us in New York. We then forwarded the reagents to Lifespan in Washington.

      9.      After the contract was executed, Malcolm An ("An"), a Lifespan employee, became our contact person. Mr. An informed me, before any analysis of Lifespan's data had been performed, that Lifespan had made a mistake in cutting the mice brains and would not be able to get counts of the estrogen receptors in certain brain regions. A copy of An's e-mail to me regarding this issue is attached hereto as Exhibit C.[2] This was a critical mistake that could render

---

2          An's e-mail refers to "7 brain samples that have not been processed." Those brain samples, however,

the data actually obtained useless. I asked An to find out what sectors of the brain could not be analyzed, so that I could determine whether any further work should be done, which An promised to do. A copy of my e-mail response to An is attached hereto as Exhibit D.

10.     However, An's employment with Lifespan was subsequently terminated, and he never provided the information that I requested. Instead Lifespan informed me that (1) the work had been completed, (2) the data was available, and (3) we should pay Lifespan the balance of the contract price. An example of the data produced by Lifespan is attached hereto as Exhibit E.

11.     Upon looking at the data, I became aware that the data were worthless. Not only were crucial brain regions unavailable (as indicated by the numerous empty data cells in Exhibit E) for analysis because of Lifespan's error, but Lifespan had not even complied with the contract in conducting the proper type of data analysis for the regions that were not missing. The contract called for a count of the various estrogen receptors in each of the brain regions. The contract specified that "Lifespan will also calculate the number of positive cells in each region and subregion." Lifespan's analysis did not provide such a count but rather gave a much less rigorous and time-consuming "impression" of the results such as "blush" or "strong" (Exhibit E).

12.     Despite its blatant error in cutting the brains, resulting in a lack of usable data, and its failure to otherwise comply with the contract,[3] Lifespan continued to demand payment under the contract. In light of the damage it suffered as a result of Lifespan's breach of contract and negligence, Karakanias Research and I commenced this action in the Supreme Court of the State

---

were from certain mice that were in the intermediate state referred to in footnote 1, above. The use of such brain samples in this experiment would have been useless.

[3]      Also, the work performed by Lifespan was not completed within the time parameters set out in the contract.

4

of New York, County of New York, on or about May 17, 2007. A copy of the complaint is attached hereto as Exhibit F.

13.     On or about June 28, 2007, Lifespan removed the case to federal court, and subsequently sent a letter to the Honorable Richard J. Holwell, seeking a pre-motion conference for a proposed motion to dismiss for lack of personal jurisdiction and improper venue, or in the alternative, to transfer the case to Washington. In lieu of a conference, the Court set out a briefing schedule for the proposed motion.

14.     In its moving papers, Lifespan suggests that I am the only New York witness who will testify at trial. Lifespan's assertion is incorrect. We intend to call several New York witnesses, consultants and technicians who worked on the NIH grant in New York, who can testify to the effect that Lifespan's breach of contract and negligence had on Karkanias Research's work in New York and on the damages to Karkanias Research. While it is premature for me to state precisely all of the witnesses we intend to call at trial, certain individuals, who are located in New York and who may testify, include Xinhe Liu, a technician working on the NIH grant, Dr. Ilir Topalli, a consultant on the project, and Dr. Peter Werner, a consultant on the project. Another consultant, who might also be called is Dr. Richardson Fleuridor, who resides in Chicago, Illinois.

15.     I also note that Lifespan claims that it does not do business in New York. However, its website contains press releases showing that it does business with two major pharmaceutical companies with their corporate headquarters in New York. Copies of the press releases are attached hereto as Exhibit G. In a press release dated December 21, 2005, Lifespan announced a multi-year agreement with Pfizer Inc., providing Pfizer with access to all of the

features of Lifespan's DrugTarget Database.  In a press release dated March 3, 2005, Lifespan announced that it had entered into an agreement with Pfizer Inc. to develop an automated pathology system for rapid and accurate evaluation of tissue specimens in preclinical studies.  In this press release, Lifespan refers to itself as Pfizer Inc.'s "partner" and refers to its work with Pfizer Inc. as a "collaboration."  In a press release dated February 7, 2001, Lifespan announced a contract with Bristol-Myers Squib Company, another pharmaceutical company with its corporate headquarters in New York, for a subscription to Lifespan's first database of information on the expression and localization of G protein-coupled receptors.  These press releases establish that Lifespan has engaged in a continuous and systematic course of doing business in New York.

16.    In addition, Lifespan solicits business in New York by sending informational newsletters by e-mail to companies in New York (among other places, I assume), advising them of the services that Lifespan provides.  I recently received such an e-mail newsletter on August 21, 2007.  A copy of the August 2007 newsletter is attached hereto as Exhibit H.

17.    In light of the foregoing, it is ludicrous to assert that Lifespan does not do business in New York or did not transact business in New York, as those terms are used in the New York long-arm jurisdiction statutes.  Lifespan solicits business in New York through its interactive website and through its Director of Sales - Northeast Region.  It has done substantial business with two pharmaceutical companies in New York, one of which it refers to in its press release as a partner.  By entering into the agreement with Karkanias Research (under its trade name of Cytira), Lifespan agreed to provide certain services that were a part of a larger scientific project funded by the NIH, which was being performed in New York.  Lifespan also agreed to send the results of its analysis to me and Karkanias Research in New York and did so by making the results

6

available via its interactive website, which results could only be accessed by password, which I used in New York, and by sending a compact disc to me containing a copy of the data.[4] These factors establish both that Lifespan does business in New York and has transacted business in New York. Accordingly, this Court has personal jurisdiction over it.

18.    As shown in the accompanying memorandum of law, venue is proper in New York.

19.    As a factual matter and as stated above, Karkanias Research has only one full-time employee and hires outside technicians and consultants as needed. Lifespan, according to its website, does business with companies all over the country and abroad. It has employees handling sales in the various parts of the country. Lifespan is in a better position financially to bear the burden of having this case heard in New York than Karkanias Research and I are to have the case heard in the Western District of Washington. Moreover travel to Washington for Karkanias Research, a company with only one full-time employee, would be extremely disruptive to its business, whereas Lifespan, with more employees, would be better able to continue operating, even with some employees in New York.

20.    Based on these facts and the law set out in the accompanying memorandum of law, there is no basis to dismiss this case or to transfer it to the Western District of Washington. Lifespan's motion should, accordingly, be denied.

---

[4]    Because of the size of publication-quality data images, not all of the data could be posted on the website, which is one reason why Lifespan sent a copy to me on a compact disc.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 10, 2007

GEORGE KARKANIAS